UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| J. C. N.<br><br>        *Plaintiff*,<br><br>  v.<br><br>MERRICK GARLAND, United States Attorney General, ALEJANDRO MAYORKAS, Secretary, United States Department of Homeland Security, UR MENDOZA JADDOU, Director, United States Citizenship and Immigration Services, and TED H. KIM, Associate Director, Refugee, Asylum, and International Operations Division, in their official capacities;<br><br>        *Defendants*. | No. _____<br><br>**COMPLAINT** |

1. Plaintiff J. C. N. ("J.C.N." or "Mr. N") is a gay, HIV-positive man who fled Nigeria for the United States in 2015 due to the persecution he faced in his home country at the hands of the police, among others. Based on that persecution, which threatened his livelihood, his health, and his life, he applied for asylum after legally entering the United States. Mr. N respectfully submits that he has a meritorious claim for asylum, and is ready and willing to demonstrate that to the United States Citizenship and Immigration Services ("USCIS"). But although he applied in 2016—nearly six years ago—he is yet to receive an initial asylum interview, much less a full adjudication of his asylum application.

2. The reason for this delay appears to be the Last-In-First-Out policy (the "LIFO Policy") adopted by Defendants for processing asylum applications in 2018. At the time Mr. N filed his application, USCIS was using a First-In-First-Out policy (the "FIFO Policy"), where applicants were generally interviewed in the order they filed their applications. Mr. N filed his application in 2016 and patiently waited for an interview, obtaining employment authorization

and working to support himself until he had a chance to prove his claims. But two years later, Defendants adopted the LIFO Policy and reversed the order of hearing applications, from those filed first to those filed last. All of Mr. N's progress in moving forward in the queue was reversed—and now, every new application filed pushed him further backwards. Under the LIFO Policy, it is entirely possible that he will *never* receive an asylum interview and be given a chance to prove his claim, and thus will *never* be granted asylum. Whatever discretion was granted to USCIS by Congress to order their scheduling of asylum interviews cannot extend to trapping applicants in a legal and psychological limbo, unsure if their asylum status will ever be adjudicated.

3. Mr. N is grateful to be in America, and hopes to make a new life here, safe from the persecution he faced in his home country. But the interminable wait for an asylum interview and adjudication has harmed Mr. N's mental health and economic well-being. Mr. N accordingly brings this action under the Administrative Procedure Act and the Mandamus Act to compel Defendants to schedule his initial asylum interview in a timely fashion and to promptly adjudicate his application on the merits.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1331, which provides federal courts with jurisdiction over federal questions.

5. The Court also has jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. § 1361, which provides federal courts with jurisdiction over mandamus actions to compel officers or employees of the United States to perform duties owed to the plaintiff.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this

district, where Defendants have unreasonably delayed in adjudicating Plaintiff's asylum application.

## THE PARTIES

7. Plaintiff J.C.N. is a citizen of Nigeria who currently lives in the Bronx, New York. Mr. N submitted an I-589 Application for Asylum and for Withholding of Removal ("asylum application") to USCIS on August 25, 2016. *See* Ex. 1 at 14. Mr. N's application was received by the Lyndhurst, New Jersey Office of USCIS and has been pending since September 6, 2016. *Id.* at 16.

8. Defendant Merrick Garland is the United States Attorney General and the chief law enforcement officer of the United States. The Immigration and Naturalization Act ("INA") authorizes the Attorney General or the Secretary of the Department of Homeland Security ("DHS") to grant asylum to aliens who qualify as refugees under the INA. 8 U.S.C. § 1158(b)(1)(A). Defendant Garland is named in this complaint solely in his official capacity.

9. Defendant Alejandro Mayorkas is the Secretary of DHS. USCIS is an agency of DHS and is responsible for scheduling asylum interviews and for adjudicating asylum applications. Defendant Mayorkas is named in this complaint solely in his official capacity.

10. Defendant Ur Mendoza Jaddou is the Director of USCIS, the agency responsible for adjudicating Mr. N's asylum claim. Defendant Jaddou is named in this complaint solely in her official capacity.

11. Defendant Ted H. Kim is the Associate Director of USCIS's Refugee, Asylum and International Operations Directorate, the subdivision of USCIS tasked with adjudicating asylum applications. Defendant Kim is named in this compliant solely in his official capacity.

## LEGAL STANDARDS FOR ASYLUM APPLICATIONS

**Right to Reasonably Speedy Adjudication of Asylum Applications**

12. "Any alien who is physically present in the United States . . . may apply for asylum." 8 U.S.C. § 1158(a)(1). Mr. N was physically present in the United States when he applied for asylum.

13. This asylum application process is meant to be speedy. The INA guides that "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed." *Id.* § 1158(d)(5)(A)(ii). The INA further guides that "in the absence of exceptional circumstances, final administrative adjudication of the asylum application . . . shall be completed within 180 days after the date an application is filed." *Id.* § 1158(d)(5)(A)(iii). These provisions collectively and individually demonstrate a strong legislative intent that asylum applications be promptly adjudicated.

14. Because asylum-seekers have a right to apply for asylum under 8 U.S.C. § 1158(a), *see, e.g.*, *Garcia v. Sessions*, 856 F.3d 27, 31 (1st Cir. 2017) (explaining that "Congress codified the right to apply for asylum in [Section] 1158(a)(1)"), they also have a right to have their asylum applications adjudicated. Absent such a right to adjudication, the right to apply would be meaningless.

15. Asylum-seekers like Mr. N also have a right to an adjudication under 8 C.F.R. § 208.9(a), a regulation through which DHS imposes on itself a duty to adjudicate asylum applications. *See* 8 C.F.R. § 208.9(a) ("The Service *shall* adjudicate the claim of each asylum applicant whose application is complete . . . and is within the jurisdiction of the Service.") (emphasis added).

Case 2:22-cv-04952   Document 1   Filed 08/08/22   Page 5 of 16 PageID: 5

16. Once federal agencies have a duty to act, the Administrative Procedure Act ("APA") requires that they act "within a reasonable time." 5 U.S.C. § 555(b).

17. Thus, asylum-seekers have a right to apply for asylum and to have their applications adjudicated within a reasonable period of time. Unfortunately, DHS's LIFO Policy, as applied to Mr. N, has prevented adjudication of his application within a reasonable period of time and threatens to do so indefinitely.

**Defendants' Last-In-First-Out Policy**

18. In January 2018, USCIS announced that as of January 29, 2018, its Asylum Division would "give priority to the most recently filed affirmative applications when scheduling asylum interviews." Ex. 2.[1] At the time Mr. N filed his application, USCIS had instead been applying a FIFO policy, in which applicants were typically interviewed in the order in which they applied.

19. Under the LIFO policy, USCIS now schedules asylum interviews according to three tiers of priority. *Id.* The first tier—i.e., applicants receiving first priority for scheduling asylum interviews—is reserved for "[a]pplications that were scheduled for an interview, but the interview had to be rescheduled at the applicant's request or [because of] the needs of USCIS." *Id.* The second tier is reserved for those applications "that have been pending 21 days or less." *Id.* The third tier, the lowest priority for receiving asylum interviews, belongs to "all other pending affirmative asylum applications." *Id.* Under the LIFO system, such applications "will be scheduled for interviews *starting with newer filings and working back toward older filings*." *Id.* (emphasis added). Thus, the earlier an individual filed for asylum, the longer they will need to wait for an interview and adjudication.

---

[1] *Available at* https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/affirmative-asylum-interview-scheduling.

5

20. The impact of the LIFO policy is that individuals who applied for asylum soon before the change in policy, like Mr. N, will wait much longer than more recent applicants to have their claims heard. If that substantial delay were for a fixed and calculable time, it would still be unfair, and likely a breach of agency discretion. But the Court need not reach that issue, as the problem Mr. N faces is significantly worse than that.

21. Under the LIFO policy, as currently applied, if USCIS receives new asylum applications more quickly than it can process old ones, applicants like Mr. N, who are buried in the third tier, will actually find themselves moving *further away* from receiving an asylum interview as time passes.

22. On information and belief, the backlog in asylum applications has grown since the LIFO Policy was implemented in 2018 and will continue to grow. According to USCIS, its backlog of old cases grew by 10% in 2018, 7% in 2019, and 13% in 2020. Ex. 3 at 5. In 2021, then USCIS Acting Director Tracy L. Renaud confessed that "USCIS receives more [asylum] cases than it can adjudicate given current resources." *Id.* at 4. And in the first quarter of the 2022 fiscal year (October through December 2021), USCIS received 31,025 affirmative asylum filings but scheduled only 10,624 interviews. Ex. 4 at 1.[2]

23. The Newark Asylum Division—the division in which Mr. N's application is pending—is not immune from this problem. In the first quarter of the 2022 fiscal year, it received 1,869 affirmative asylum applications but scheduled only 1,649 interviews, of which only 983 were completed. *Id.* at 4, 8. At this rate, Mr. N will never receive an interview.

24. The reasonableness of Defendants' policy for individuals who applied for asylum *after* the announcement of the LIFO Policy is not at issue here. Nor is how USCIS should

---

[2] *Available at:* https://www.uscis.gov/sites/default/files/document/data/Asylum_Division_Quarterly_Statistics_Report_FY22_Q1_V4.pdf.

address the general issue of the backlog in asylum applications. But by now—after six years of waiting, and no end plausibly in sight—it is clear that the specifics of Defendants' LIFO policy, as applied to Mr. N, are unreasonable. The fact that Mr. N's wait time will grow ever longer until USCIS can make its way through an ever-increasing backlog of cases does not defer Mr. N's right to adjudication of his asylum application, but rather denies it. Indeed, it is likely that Mr. N is further from receiving an interview now than he was when he began this process.

25. Defendants' LIFO policy, combined with USCIS's ever-growing backlog of cases, has pushed Mr. N further and further away from ever receiving the asylum interview and adjudication to which he is entitled. This cannot be reconciled with the terms of the INA and the APA. The agency's standard operating procedure simply cannot constitute "exceptional circumstances" that would justify a lengthy delay in adjudication under the INA. Moreover, a six-year delay that has no prospect of ever ending cannot be reasonable under the APA, at least as applied to Mr. N. Mr. N is accordingly entitled to have his asylum interview promptly.

## MR. N'S MERITORIOUS CLAIM FOR ASYLUM

26. As set forth below and in the attached declaration, *see* Ex. 5, Mr. N qualifies for and should be granted asylum.

**Country Conditions for Gay and HIV-Positive Men in Nigeria**

27. Mr. N is a gay man from Nigeria, one of the world's leaders in the fight *against* gay rights.

28. Consensual sex between individuals of the same sex has long been illegal in Nigeria and is punishable by up to fourteen years in prison nationally and, in several states, by "death by stoning" for men and "whipping and/or imprisonment" for women. Ex. 6, Human

Rights Watch, *"Tell Me Where I Can Be Safe": The Impact of Nigeria's Same Sex Marriage (Prohibition) Act* (Oct. 2016) at 16.[3]

29. To make a terrible situation worse, in 2014, Nigeria passed the Same-Sex Marriage (Prohibition) Act of 2014 ("SSMPA"), which forbade "any cohabitation between same-sex sexual partners, . . . any public show of [a] same sex amorous relationship," and even registering, operating, or participating in "gay clubs, societies [or] organization[s]." *Id.* at 1 (internal quotation marks omitted).

30. Gay Nigerians also face interpersonal violence from people intent on harming them because of their sexuality.

31. Such persecution is met with indifference—or even worse, active collaboration—by law enforcement officers. In Nigeria, the police use the SSMPA as a pretext to "humiliate and degrade LGBT individuals, with flagrant impunity, often in the presence of members of the public." *Id.* at 34. Once gay Nigerians are in police custody, they may be tortured, sodomized, beaten, detained for days, photographed in humiliating positions, or simply extorted for "bail," that is, forced to pay a bribe so as not be arrested under the SSMPA. *Id.* at 34–39. In Mr. N's case, as explained below and in his declaration, this is not a mere possibility—he has been physically assaulted and extorted by the police.

32. Discrimination against HIV-positive individuals is also widespread in Nigeria. For instance, employers frequently discriminate against HIV-positive employees and many HIV-positive Nigerians now fear to go to the doctor to be treated for HIV as doctors may ask them if they are having gay sex.

---

[3] Available at: https://www.hrw.org/sites/default/files/report_pdf/nigeria1016_web.pdf.

**Mr. N Was Persecuted in Nigeria**

33. Mr. N is gay and has been forced to spend most of his life hiding his sexuality. He is also an actor who appeared in multiple Nigerian films before being forced to flee his home for the United States.

34. In 2010, an acquaintance of Mr. N stole his phone and, when cornered by the police, told the police that Mr. N was gay. As a crowd gathered to chant homophobic slurs and insults at Mr. N, the police accused him of being gay and extorted him by demanding that he pay them ₦2,000 in order to leave.

35. The next year, Mr. N was lured to the neighboring county of Benin under false pretenses. When Mr. N arrived, he was kidnapped, beaten, and robbed by a group of men who attacked him due to his sexuality. Mr. N never reported this attack because he feared police officers would once again persecute him.

36. Mr. N's life grew even harder in 2014 after Nigeria passed the SSMPA, a popular new law banning gay marriage, amorous same-sex relationships, and belonging to gay rights organizations.

37. In 2014, another man stabbed Mr. N, threatened to kill him, and threatened to expose his homosexuality. The man also summoned an armed mob of ten men to Mr. N's house to menace him. Once again, Mr. N did not notify law enforcement for fear of being persecuted by the police. In the following months, that man and members of his mob tried several more times to attack Mr. N.

38. After the incident with the mob, Mr. N concluded that his life was in serious danger if he remained in Nigeria and he successfully applied for a visa to travel to the United States for an African film awards ceremony. The day before his planned departure, the police summoned Mr. N to their station, slapped him hard across the face, locked him up, and

threatened to tell the world he was gay. Mr. N was only released after paying a bribe. He went directly to the airport and then on to America.

39. In addition to being gay, Mr. N is also HIV positive. Mr. N first tested positive for HIV in 2012 but did not receive any treatment for his condition in Nigeria because HIV carries a terrible stigma there. *See, e.g.*, Ex. 6 at 49 (describing HIV-positive Nigerians' fear of going to the doctor to be treated for HIV as doctors may ask them if they are having gay sex).

40. Based on this past persecution and his well-founded fear of future persecution should he be forced to return to Nigeria, Mr. N is eligible for asylum.

**Mr. N's Life in America and Pending Asylum Application**

41. Mr. N arrived in the United States on September 10, 2015 and applied for asylum on August 25, 2016. He has been living, working, and receiving treatment for his HIV in New York City ever since.

42. As of the time of the filing of this complaint, Mr. N's asylum application has been pending for almost six years and USCIS still has not scheduled him for an interview.

43. This delay has harmed Mr. N's mental health. He feels that his life is forever on pause. He also has to live with the anxiety caused by not knowing if he can fully start a new life in America or whether he must one day return to his potential death in Nigeria.

44. This delay has also harmed Mr. N's economic well-being. He cannot travel abroad to seek business opportunities created by his fame as an actor. For instance, Mr. N was once forced to turn down an opportunity to participate in an international fashion show because he cannot leave the United States due to his lack of permanent asylum status. Furthermore, without such status, he cannot be hired for jobs that match his skill level, despite wanting and feeling qualified for higher-skilled work.

45. On information and belief, the ever-lengthening delay in adjudicating Mr. N's asylum application will also prejudice his ability to assist in his own asylum process because his ability to substantiate the persecution he suffered in Nigeria will necessarily fade over time, even though the threat of future persecution likely will not.

**Mr. N's Efforts to Receive an Asylum Interview**

46. Mr. N has already done everything he can to obtain an asylum interview, short of filing this lawsuit.

47. On December 22, 2021, Mr. N (through counsel) contacted the Representative for his Congressional District to ask for any possible help expediting his application. *See* Ex. 7. Mr. N received no response.

48. On January 4, 2022, counsel wrote to the Newark Asylum Office to request that Mr. N be placed on the office's "short list" to be interviewed with minimal notice. *See* Ex. 8. Counsel received a response that Mr. N had been placed on the short list and could "be contacted for an interview," if "an interview appointment becomes available on short notice." *See* Ex. 9. Seven months later, however, Mr. N has received no word about any potential interview, or been advised about how much longer he may have to wait.

## COUNT ONE
## (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

49. Mr. N repeats and realleges the above paragraphs as if fully set forth herein and incorporates them by reference.

50. Mr. N has a right to apply for asylum and to have his asylum application adjudicated within a reasonable period of time.

51. Defendants have a corresponding and non-discretionary duty to adjudicate Mr. N's application within a reasonable period of time.

52. Defendants have failed to adjudicate Mr. N's application within a reasonable period of time and, if they continue to apply their LIFO policy to him, may *never* adjudicate his application.

53. Under the APA, the Court is empowered to "compel agency action" that has been "unreasonably delayed." 5 U.S.C. § 706(1).

54. Defendants' nearly six-year delay in scheduling Mr. N for an interview and in adjudicating his asylum application constitutes an unreasonable delay under the *TRAC* factors articulated in *Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984).

55. First, the multi-year delay Mr. N has suffered is not the product of a "rule of reason." Whatever rational intent the LIFO policy may have had in 2018, its application in this case has been unreasonable. The LIFO policy permanently or semi-permanently forecloses asylum-seekers from having their applications adjudicated if they—like Mr. N—were unlucky enough to already be deep in the backlog in January 2018. USCIS cannot plausibly contend that an indefinite and possibly infinite waiting period is reasonable.

56. Second, Congress has provided clear and strong guidance that initial asylum interviews should occur within 45 days of filing and that asylum applications should be processed within 180 days, absent exceptional circumstances. *See* 8 U.S.C. §§ 1158(d)(5)(A)(ii); 1158(d)(5)(A)(iii). The typical application of a years-old policy cannot constitute exceptional circumstances as to Mr. N—indeed, other than the timing of his application relative to the adoption of the LIFO Policy, there is nothing at all about his case that appears to have prompted this delay.

57. Third, the nearly six-year delay Mr. N has suffered has harmed his health and welfare. He has been damaged psychologically by the permanent limbo in which he languishes, unable to start a new life or even to take comfort from the idea that he will not be deported to his death in Nigeria. The delay has also damaged Mr. N economically by limiting the business opportunities he can seek now and in the future. Furthermore, he is unable to freely move within the United Sates for fear that moving will disrupt his pending asylum application, which severely restricts where he can live and the jobs he can pursue.

58. Fourth, promptly providing Mr. N with the asylum interview and adjudication he is legally entitled to will in no way compromise USCIS activities of a higher or equal priority.

59. Fifth, this long delay has otherwise prejudiced Mr. N by jeopardizing his ability to participate in his own asylum process. The longer Mr. N must wait to argue for his right to stay in America, the less well he will be able to substantiate the horrific things that happened to him in Nigeria.

60. As Mr. N has followed all requirements for seeking asylum and has exhausted all options to obtain an interview short of filing this lawsuit, he now seeks a court order pursuant to 5 U.S.C. § 706(1) compelling Defendants to promptly schedule his asylum interview and to adjudicate his asylum application.

## COUNT TWO
## (MANDAMUS)

61. Mr. N repeats and realleges the above paragraphs as if fully set forth herein and incorporates them by reference.

62. Under the Mandamus Act, 28 U.S.C. § 1361, relief may be granted because Defendants owe Mr. N a non-discretionary duty to adjudicate his application within a reasonable period of time and Plaintiff has exhausted all other avenues of relief to obtain such adjudication.

63. Mr. N's right to this timely adjudication is clearly established by the INA, *see* 8 U.S.C. §§ 1158(d)(5)(A)(ii); 1158(d)(5)(A)(iii), the APA, *see* 5 U.S.C. § 555(b), and federal regulations, *see* C.F.R. § 208.9(a). Though USCIS has discretion in granting or denying applications, it has no discretion to delay six or more years in scheduling Mr. N for an interview.

64. Aside from his APA claim, Mr. N has no adequate remedy at law.

65. Mr. N will continue to suffer substantial, irreparable harm to his mental health and livelihood if his application is not promptly processed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to:

a. Issue an order pursuant to 5 U.S.C. § 706(1) compelling Defendants to promptly schedule Plaintiff's asylum interview and to promptly adjudicate Plaintiff's I-589 Applications for Asylum and for Withholding of Removal.

b. Issue a writ of mandamus or in the nature of mandamus, pursuant to 28 U.S.C. § 1361, compelling Defendants to promptly schedule Plaintiff's asylum interview and to promptly adjudicate Plaintiff's I-589 Applications for Asylum and for Withholding of Removal.

c. Grant attorneys' fees and costs under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412(2), *et seq.*; and

d. Grant such other relief as the Court deems necessary and proper.

Date: August 5, 2022                                                     Respectfully submitted,


                                        /s/ *Michael Buchanan*
                                        Michael F. Buchanan
Amy Vegari (*pro hac vice motion to be filed*)
Peter Vogel (*pro hac vice motion to be filed*)

**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
*Pro Bono Attorneys for J. C. N.*

## **CERTIFICATE OF SERVICE**

    I, Michael Buchanan, hereby certify that on August 5, 2022, I caused a copy of the foregoing *Complaint* to be served on all counsel and parties of record in the above-captioned matter via ECF filing.

                                               /s/ *Michael Buchanan*
                                               Michael F. Buchanan